## STATE OF CONNECTICUT *v.* MARK BOVA
### (15221)

Callahan, C. J., and Borden, Katz, Palmer and McDonald, Js.

---

Argued December 11, 1996—officially released March 18, 1997

*John R. Williams*, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom, on the brief, was *Mary Galvin*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Mark Bova, was convicted after a jury trial of murder in violation of General Statutes § 53a-54a (a) and conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a).[1] The defendant appeals from the judgment of the

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or

trial court sentencing him to concurrent prison terms of sixty years on the murder count and twenty years on the conspiracy count.[2] He claims that the trial court improperly: (1) restricted his cross-examination of several witnesses in violation of his right to confront his accusers as guaranteed by the sixth amendment to the United States constitution; (2) denied his motion to suppress incriminating evidence seized from his home pursuant to a search warrant issued in violation of the fourth amendment to the United States constitution; (3) precluded him from introducing certain evidence in violation of his right to present a defense as guaranteed by the sixth and fourteenth amendments to the United States constitution; (4) overruled his objections to certain allegedly inflammatory comments by the state during its closing argument, thereby depriving him of a fair trial; and (5) concluded that the evidence was sufficient to support the verdict of guilty of the crime of conspiracy to commit murder. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 29, 1992, at approximately 1:12 a.m.,

acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

the defendant, accompanied by his father, approached Michael Pace, an officer of the Orange police department, in the Stop and Shop Supermarket parking lot in Orange. The defendant told Pace that he wanted to report that his wife, Susan Bova, was missing. According to the defendant, his wife had left their Ansonia home to go shopping between 7 and 7:30 p.m. the preceding evening and had not returned. The defendant further stated that he had just discovered his wife's car, a Chevrolet Cavalier, parked across the street from the Stop and Shop Supermarket in the parking lot of the Bradlees Department Store (Bradlees).

Pace then followed the defendant to the Cavalier, searched the vehicle and found only a plastic bag of clothing in the trunk. After Pace had completed a missing person report, the defendant drove the Cavalier home.

Shortly thereafter, the West Haven police department was notified that the body of a woman had been found in a soccer field near the Bradlees parking lot. The defendant was so informed by the police, and he immediately proceeded to the field. Upon his arrival there, he was shown the body, which he identified as his wife. According to the testimony of several police officers, including Officers Usha Carr and Louis Matteo of the West Haven police department, the defendant showed no emotion upon viewing his wife's body.

The defendant cooperated with the police investigation of his wife's death, consenting to a search of his home and to a second search of the Chevrolet Cavalier later in the day on January 29. Although the investigating officers found no evidence causing them to link the defendant to the murder, two West Haven police officers, including Matteo, observed that the defendant's entire home recently had been thoroughly cleaned and vacuumed. The officers also noticed sawdust on

the floor of the garage, most of which had been swept up and deposited into a small metal container located in the garage. Finally, the officers observed several wood chips on the passenger seat of the Cavalier.

During the investigation, the defendant told the police about an extramarital affair that he had had with Diane Donofrio. According to the defendant, he began the affair with Donofrio in 1985, three years after his marriage to the victim. In addition to evidence of the defendant's relationship with Donofrio, there was evidence of the generally unstable nature of the defendant's marriage to the victim. Specifically, the couple had separated on two occasions, and the victim had commenced divorce proceedings against the defendant in the year preceding her death. The victim had withdrawn the marital dissolution action in November, 1991, after she and the defendant had reconciled.

The evidence also revealed that the defendant was suffering from financial difficulties. In 1984, the defendant had left his job as a produce manager at a grocery store and borrowed $180,000 from his parents to start an automotive supply business with his brother. The business failed, however, and the defendant returned to a lower paying position at the grocery store. At the time of the victim's death, the defendant still owed monthly payments of over $500 to his parents. There was also evidence that the defendant, as the primary beneficiary under two life insurance policies issued to the victim totaling $296,900, was in a position to benefit financially from her death.

Four months after the victim's death, the West Haven police sought and obtained a search warrant for the defendant's home. The affidavit in support of the warrant indicated that wood particles and synthetic fibers resembling carpet had been discovered on the clothing worn by the victim at the time her body was discovered.

The search warrant authorized the police to search the defendant's home for such materials. Upon execution of the search warrant, the police seized carpet fibers and wood fragments that matched those found on the victim's clothing.

In May, 1993, the defendant terminated his relationship with Donofrio and moved in with another woman. Two months later, Donofrio contacted the West Haven police to report that the defendant had killed the victim. Thereafter, Donofrio explained that she and the defendant had discussed his plans to murder the victim at least one week prior to the murder. Specifically, the defendant told Donofrio that he loved her and could not afford a divorce, that he intended to kill the victim by strangulation, and that he would commit the murder on a Tuesday because he did not work on Wednesday.

Donofrio testified that the defendant telephoned her between 6 and 6:30 p.m. on Tuesday, January 28, 1992, to tell her that he was in the process of killing the victim and that he needed her assistance. When Donofrio arrived at the defendant's home a few minutes later, she found the defendant and the victim in the couple's bedroom. The victim was lying on the bed, face down and unconscious. The defendant, who was on top of the victim, was strangling her with an extension cord. Because the victim continued to exhibit a pulse, the defendant began to strangle her manually, holding his thumbs on the back of her head and his fingers at the front of her neck. Donofrio then helped the defendant move the victim from the bed onto the floor, where they took turns smothering her with a pillow until she had no pulse.

Shortly thereafter, the defendant awoke his one year old son and strapped him into an infant seat in the back seat of Donofrio's car. The defendant gave Donofrio the extension cord, the pillow and the victim's pocket-

book and instructed Donofrio to meet him at the Bradlees parking lot in Orange. Donofrio then left the defendant's home and drove to the Bradlees parking lot. Approximately twenty minutes later, the defendant arrived at the parking lot, driving the victim's Cavalier. The defendant explained to Donofrio that he had moved the victim's body to his garage, placed it in the Cavalier, and then driven to the soccer field, where he had discarded the body. The defendant left the Cavalier in the Bradlees parking lot, and Donofrio gave him and his son a ride home. According to Donofrio, she later placed the pillow in a charity's used clothing bin, gave the infant seat to a coworker, and placed the other objects in the trash.[3]

The forensic evidence presented at trial corroborated Donofrio's testimony. The medical examiner testified that the victim had died from strangulation by a long, thin ligature, such as a lamp cord. In addition to two separate sets of ligature marks on the victim's neck, bruises on her neck indicated that she also had been strangled manually. An examination of the victim's voice box revealed a pattern of broken bones consistent with Donofrio's testimony that the victim had been strangled from behind. The medical examiner further indicated that the assault on the victim had lasted for up to twenty to thirty minutes. In addition, hairs similar to those of the defendant were found on the victim's jacket, and hairs similar to those of Donofrio were found on the victim's pants. Finally, because there was no sign of a struggle at the location where the victim's body was found, it appeared that the victim had been killed somewhere else, and that her body had been

[3] Donofrio pleaded guilty to conspiracy to commit murder and was sentenced to a term of imprisonment of ten years, execution suspended after four years, and three years probation. She also pleaded guilty to making a false statement to the police, for which she received an unconditional discharge.

transported to the field. Additional facts will be set forth as necessary.

## I

The defendant claims that several evidentiary rulings by the trial court impermissibly infringed his rights under the confrontation clause of the sixth amendment to the United States constitution.[4] Specifically, the defendant argues that the trial court improperly precluded him from cross-examining: (1) Officer Carr regarding Carr's alleged excessive use of force on two occasions unrelated to this case; (2) Officer Matteo regarding his allegedly false testimony in a prior, unrelated case; and (3) Donofrio regarding her alleged stalking of the defendant and his new girlfriend. The defendant also maintains that the trial court improperly prohibited him from: (1) introducing Carr's official report of the defendant's identification of the victim as a prior inconsistent statement; and (2) adducing the testimony of John Marganski, a former lover of Donofrio, regarding her jealous and possessive nature. We reject each of these claims.

"Our analysis of the defendant's claim[s] begins with the axiom that the defendant is entitled to confront and cross-examine fairly and fully the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to

---

[4] The pertinent provision of the sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Pratt*, 235 Conn. 595, 603–604, 669 A.2d 562 (1995). "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331, 618 A.2d 32 (1992). "Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest . . . ." (Citations omitted.) *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993).

"This right is not absolute . . . but may bow to other legitimate interests in the criminal trial process. . . . Such an interest is the trial court's right, indeed, duty, to exclude irrelevant evidence. The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Pratt*, supra, 235 Conn. 604–605.

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995). Furthermore, "[t]o establish an abuse of

discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Internal quotation marks omitted.) *State* v. *Castro*, 196 Conn. 421, 426, 493 A.2d 223 (1985). Finally, "[t]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Barnes*, supra, 747. With these principles in mind, we now turn to the defendant's claims.

A

The defendant contends that the trial court impermissibly limited his cross-examination of Carr with respect to Carr's testimony that the defendant showed no emotion when viewing the victim's body.[5] Specifically, the defendant sought to question Carr about two pending civil actions alleging that Carr had used excessive force in the discharge of his official duties. The defendant asserted that these two assault claims tended to establish Carr's propensity to violate the law and, consequently, that the allegations undermined his credibility as a witness. The trial court disagreed, concluding that: (1) because the suits were still pending, the allegations remained unproven; (2) the inquiry would invite testimony regarding collateral matters; and (3) in any event, the allegations did not implicate Carr's credibility.

"The right to cross-examine a witness concerning specific acts of misconduct is limited in three distinct ways. First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issue of veracity . . . . Second, [w]hether to permit cross-

---

[5] As the first police officer to arrive at the soccer field, it was Carr's primary responsibility to secure the area surrounding the victim's body and to keep a log of the identity of the persons who arrived at the scene and how long they remained there.

examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 60, 671 A.2d 323 (1996); see also *State* v. *Avis*, 209 Conn. 290, 304, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989).

We previously have stated that acts of violence generally have little direct or special bearing on a witness' credibility. See, e.g., *State* v. *Wright*, 198 Conn. 273, 278, 502 A.2d 911 (1986); *State* v. *Carter*, 189 Conn. 631, 644, 458 A.2d 379 (1983); see also *State* v. *Nardini*, 187 Conn. 513, 523–24, 447 A.2d 396 (1982). The defendant has failed to demonstrate how the two pending claims against Carr alleging the use of excessive force bear any particular relevance to his veracity as a witness in this case, especially since those claims remain unproven. Accordingly, we conclude that the trial court did not abuse its discretion in prohibiting the defendant from questioning Carr about those allegations.[6]

B

The defendant next claims that the trial court improperly restricted his cross-examination of Matteo regarding an unrelated criminal case in which a judge had concluded that Matteo's testimony was not as credible as that of another witness. The following additional facts are necessary to our resolution of this claim.

In June, 1993, Matteo submitted an affidavit in support of an arrest warrant for Robert Bright charging Bright with drug related offenses. In his affidavit, Matteo represented that he had been provided with

---

[6] Three other police officers also testified regarding the defendant's lack of emotion upon viewing the victim's body. Thus, even if we had concluded that the trial court had improperly excluded evidence of Carr's alleged misconduct, such exclusion would have been harmless.

certain information about Bright's alleged drug dealing operation by Kevin Boone, an auxiliary West Haven police officer. Acting in reliance on the representations contained in Matteo's affidavit, a judge of the Superior Court signed the arrest warrant. Bright subsequently moved to dismiss the drug related charges on the ground that Matteo's characterization of Boone's comments in the affidavit regarding Bright's drug dealing operation were false.

At the hearing on Bright's motion to dismiss before Judge David Skolnick, Matteo testified that the affidavit accurately reflected Boone's representations to him. Boone testified, however, that he had never provided Matteo, or anyone else, with information about Bright's drug dealing activities. Although Judge Skolnick denied Bright's motion to dismiss the drug related charges, he stated in his memorandum of decision that "[t]he court finds that [o]fficer Boone's testimony is the more credible." *State* v. *Bright*, Superior Court, judicial district of Ansonia-Milford at geographical area number twenty-two, Docket No. CR22-15040 (August 11, 1994).

On direct examination in this case, Matteo testified that he had conducted a consensual search of the defendant's home on the day of the victim's murder, and that all of the rooms had been cleaned and the rugs recently vacuumed. Matteo also testified regarding the defendant's impassive demeanor upon viewing the victim's body. On cross-examination, the defendant elicited testimony from Matteo that he had transferred voluntarily from the narcotics division of the police department back to the patrol division. The defendant then asked Matteo whether he had sought the transfer because "one of the other judges [of] this court made a ruling that you had committed perjury." The state objected to the question, and the trial court excused the jury. The defendant, characterizing Judge Skolnick's conclusion in *Bright* as a finding that Matteo had com-

mitted perjury, argued that he had a sixth amendment right to bring that finding to the jury's attention and to question Matteo about it. After reviewing Judge Skolnick's memorandum of decision in *Bright*, the trial court concluded that it contained no finding that Matteo had perjured himself or otherwise intentionally provided false testimony and, further, that Judge Skolnick's conclusion reasonably may have been based on his belief that Boone's recollection of the pertinent events was better than that of Matteo's. After allowing the defendant to question Matteo outside the presence of the jury, the trial court decided that it would permit defense counsel to cross-examine Matteo in the jury's presence about Matteo's testimony in *Bright*. The trial court, however, precluded the defendant from referring to Judge Skolnick's memorandum of decision and from introducing extrinsic evidence to contradict Matteo's responses on cross-examination. Under questioning from the defendant in the jury's presence, Matteo stated that he had testified truthfully at the hearing on Bright's motion to dismiss.

We conclude that the trial court did not abuse its discretion in limiting the defendant's cross-examination of Matteo. The trial court reasonably concluded that Judge Skolnick had made no finding, either express or implied, that Matteo had lied about his purported discussions with Boone. In light of its conclusion that Judge Skolnick's finding in *Bright* bore little or no significance upon the issue of Matteo's veracity, the trial court acted within its discretion in precluding the defendant from using Judge Skolnick's decision for impeachment purposes. See *State v. Chance*, supra, 236 Conn. 60; *State v. Lee*, 229 Conn. 60, 70–71, 640 A.2d 553 (1994); *State v. Avis*, supra, 209 Conn. 304; *State v. Martin*, 201 Conn. 74, 85–86, 513 A.2d 116 (1986). Furthermore, the defendant was allowed to question Matteo about his testimony in *Bright*, and the defendant

was otherwise afforded wide latitude in his cross-examination of Matteo. Accordingly, the restrictions placed on the defendant's cross-examination of Matteo did not constitute an impermissible infringement of his rights under the confrontation clause of the sixth amendment.[7]

## C

The defendant next maintains that the trial court improperly restricted his cross-examination of Donofrio regarding her bias against him. The following additional facts are necessary to an understanding of this claim.

On cross-examination, Donofrio admitted that: (1) she had informed the victim of her ongoing affair with the defendant in an effort to cause the victim to divorce the defendant so that Donofrio could be with him; (2) after the victim's death, she relocated her residence to be near the defendant; (3) when first questioned by the police, she stated that she had no knowledge about the victim's murder; (4) she told the police about the defendant's role in the murder only after the defendant had terminated their relationship and had begun a romantic relationship with Lisa Sheldon; (5) in her initial statements to the police implicating the defendant in the victim's murder, she had repeatedly and intentionally lied about her own involvement in the killing; and (6) she hated the defendant and wanted to destroy him. On cross-examination, the defendant asked Donofrio why she had been at the corner of Prindle and Main Streets in Ansonia, near the defendant's residence, prior to the commencement of court proceedings the previ-

[7] Moreover, Matteo's testimony was supported in all material respects by testimony from other West Haven police officers. In light of the fact that Matteo's testimony was fully corroborated by other witnesses, and because that testimony was not central to the state's case against the defendant, any possible impropriety by the trial court in limiting the defendant's cross-examination of Matteo was harmless beyond a reasonable doubt.

ous morning. The state objected to the question on the ground of relevancy, and the trial court excused the jury to allow the defendant to make an offer of proof.

On voir dire examination by the defendant, Donofrio acknowledged that she had traveled near the corner of Prindle and Main Streets on her way to the courthouse from her attorney's office on Wakelee Avenue, but she denied being at that intersection. She further testified that it was merely a coincidence that her route to the courthouse had placed her in the general vicinity of the defendant's home that morning. Defense counsel also asked Donofrio: "[W]hat were you doing in Shelton last Memorial Day?" Donofrio responded that she had been visiting a friend. Defense counsel then stated: "It just happened to be located right behind the house of Lisa Sheldon?" Donofrio responded that she had had no idea where Lisa Sheldon was living at that time.

The defendant argued that he was entitled to pursue this line of questioning in the jury's presence, claiming "that we have here a pattern of stalking [the defendant] and his friend which, in fact, demonstrates a bias and motive on the part of this witness." The trial court concluded that the proffered evidence was irrelevant and, consequently, sustained the state's objection on that ground.

We agree with the state that the trial court properly precluded the defendant from pursuing this line of inquiry. Although bias reasonably may be inferred from stalking, the trial court properly concluded that the defendant had failed to establish a sufficient factual basis for his claim. "Bias may be established in a variety of ways, one such way being the showing of partiality of mind. Partiality of mind whether arising out of favoritism for one side or hostility toward the other is a proper subject of inquiry on cross-examination. . . . Such partiality may be shown not only by direct evi-

dence but also indirectly by conduct or language. . . . But when partiality is claimed circumstantially the inference must be one that can be fairly drawn from the circumstances. The inference in . . . [this] sort of evidence is from conduct or language to the feelings inspiring it; the only question is whether from the conduct or language a palpable and more or less fixed hostility (to one party) or sympathy (for the other) is inferable. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Haskins*, 188 Conn. 432, 454, 450 A.2d 828 (1982). "The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable." (Internal quotation marks omitted.) *State* v. *Barnes*, supra, 232 Conn. 746. "Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 305, 664 A.2d 743 (1995).

The defendant's offer of proof failed to establish an evidentiary foundation sufficient to support an inference that Donofrio had been stalking either the defendant or Sheldon. In the absence of such a foundation, Donofrio's testimony regarding her drive to the courthouse on the previous day and her visit to a friend's house on Memorial Day was irrelevant. *State* v. *Barnes*, supra, 232 Conn. 747–48. Furthermore, the defendant had already elicited numerous admissions by Donofrio that clearly established her intense and abiding hostility toward him. Accordingly, we reject the defendant's claim that he was entitled to cross-examine Donofrio about the alleged stalking incidents.

D

The defendant further claims that the trial court improperly prohibited him from introducing into evi-

dence Carr's official report of the activities at the soccer field on the morning that the victim's body was found. The defendant claimed that in light of Carr's testimony that the defendant displayed no emotion upon viewing the victim's body, the report was admissible as a prior inconsistent statement because it contains no mention of the defendant's reaction to the sight of the body. After reviewing Carr's report, the trial court sustained the state's objection to its introduction on the ground that it was not inconsistent with Carr's testimony.

The credibility of a witness may be attacked by introducing the witness' materially inconsistent prior statement. *State* v. *Bruno*, 236 Conn. 514, 554, 673 A.2d 1117 (1996); *State* v. *Avis*, supra, 209 Conn. 302; *G & R Tire Distributors, Inc.* v. *Allstate Ins. Co.*, 177 Conn. 58, 60–61, 411 A.2d 31 (1979). In deciding whether the statement is admissible, the trial court must review it in light of the witness' entire testimony to determine whether it is, in fact, inconsistent with that testimony; *State* v. *Richardson*, 214 Conn. 752, 764, 574 A.2d 182 (1990); *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); *State* v. *Piskorski*, 177 Conn. 677, 710, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); and, if so, whether such inconsistency is "substantial and relate[s] to a material matter." (Internal quotation marks omitted.) *State* v. *Richardson*, supra, 763–64. "Such a determination as to inconsistency lies within the discretionary authority of the trial court." (Internal quotation marks omitted.) *State* v. *Bruno*, supra, 554.

The defendant contends that Carr's failure to note in his report the defendant's impassive demeanor at the sight of the victim's body undermines the credibility of Carr's trial testimony that the defendant showed no emotion upon viewing the body. The fact that the report contains no reference to the defendant's demeanor,

however, is not inconsistent with Carr's testimony. " 'If a former statement fails to mention a material fact presently testified to, which it should have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent.' " *State* v. *Reed*, 174 Conn. 287, 303, 386 A.2d 243 (1978), quoting *State* v. *Chesney*, 166 Conn. 630, 636, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974). In this case, the trial court properly concluded that there was no reason for Carr to have included his observations regarding the defendant's demeanor in his report because the report was written primarily for the purpose of documenting the steps that he took to secure the scene and to preserve the evidence. See footnote 5. Moreover, the defendant was allowed, during his cross-examination of Carr, to elicit the fact that Carr had not included anything in his report relative to his observation of the defendant at the time he identified the victim's body.[8] Accordingly, the trial court did not abuse its discretion in prohibiting the defendant from introducing into evidence Carr's report.

## E

The defendant also claims that the trial court improperly prohibited him from presenting the testimony of John Marganski, a former lover of Donofrio, for the purpose of discrediting Donofrio's testimony. Marganski would have testified regarding Donofrio's character traits of jealousy and possessiveness. He also would have provided specific examples of her obsessive and covetous behavior toward him during the course of their intermittent relationship, which lasted from approximately November, 1989, to November, 1990. The state objected to Marganski's testimony on the grounds

---

[8] As we have noted; see footnote 6; Carr's testimony was corroborated by several other witnesses. Thus, even if we had concluded that the trial court had improperly excluded Carr's report, such exclusion would have been harmless.

that his relationship with Donofrio was remote in time, that Donofrio had already admitted that she was extremely possessive of the defendant, and that the evidence was collateral and would be confusing to the jury. The trial court sustained the state's objection, concluding that Marganski's testimony was too remote and attenuated to bear upon Donofrio's admitted hostility toward the defendant.

As we have indicated, evidence is probative of bias if a witness' hostility to or sympathy for a party is reasonably inferable from that evidence. *State* v. *Haskins*, supra, 188 Conn. 454. The trial court has broad discretion, however, in determining the admissibility of evidence claimed to be remote, repetitious, or otherwise lacking in probative value. See, e.g., *State* v. *Lee*, supra, 229 Conn. 70; *State* v. *Ireland*, 218 Conn. 447, 452, 590 A.2d 106 (1991); *State* v. *Gaynor*, 182 Conn. 501, 511, 438 A.2d 749 (1980). "Generally speaking, the question of remoteness, as justifying the exclusion of evidence, must depend upon all the considerations, including time, the character of the evidence, and all the surrounding circumstances which in the opinion of the court ought to have a bearing upon its worthiness to be brought into the consideration and determination of the matter in contention." (Internal quotation marks omitted.) *State* v. *Hernandez*, 224 Conn. 196, 203, 618 A.2d 494 (1992).

We are persuaded that the trial court did not abuse its discretion in concluding that any link between Marganski's involvement with Donofrio years earlier and Donofrio's bias toward the defendant was so attenuated as to render it unworthy of the jury's consideration. Furthermore, Donofrio freely acknowledged on direct and cross-examination that she had behaved in a possessive and jealous manner toward the defendant, and that she harbored great hostility toward him. Under these circumstances, the preclusion of Marganski's tes-

timony did not constitute an unreasonable limitation on the defendant's right to establish Donofrio's bias against him.

## II

The defendant next claims that the trial court improperly denied his motion to suppress wood particles seized from his garage pursuant to a search warrant. Specifically, the defendant maintains that the information relied upon by the issuing magistrate regarding the presence of wood particles in the defendant's garage was stale and, consequently, that the warrant, insofar as it authorized the police to search for and to seize such particles, was not supported by probable cause as required by the fourth amendment to the United States constitution.[9] We disagree.[10]

The following additional facts are relevant to our determination of this claim. Upon discovering the victim's body, the police observed sawdust and small wood fragments on her clothing. Later that day, Officers Matteo and James Sweetman of the West Haven police department obtained the defendant's consent to search his home for possible clues to the victim's murder. The officers found the home to be neat, clean, and recently vacuumed. The garage contained sawdust, wood particles and oil marks, but was otherwise clean.

On May 8, 1992, more than three months after the murder, Detectives Burton Gifford and Paul Raucci of the West Haven police department sought and obtained a search warrant for the defendant's home. The affidavit

---

[9] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[10] The defendant does not claim that the affidavit in support of the search warrant was otherwise lacking in probable cause.

in support of the application for the warrant included information sufficient to permit an inference that the victim had been strangled in her home, and that her body had been dragged through the house and into the garage. The affidavit also indicated: that numerous wood fragments had been found on the clothing covering the victim's back and buttocks at the time her body was discovered; that on the day of the victim's death, the police had observed fresh sawdust and wood particles on the floor of the defendant's garage, most of which had been swept up and deposited into a small metal container; that the defendant had told the police that the sawdust had been deposited on the garage floor during his construction of a deck to be installed at the rear of his home; and that on May 5, 1992, the affiants had observed the deck leaning up against the rear of the defendant's home. Finally, the affiants represented that the wood particles had been identified by state forensic experts as "[h]ard pine, Douglas fir, and true fir," and that it was likely that a search of the defendant's premises would reveal such particles. Upon execution of the warrant on May 11, 1992, the police seized wood fragments from the defendant's garage that matched those found on the victim's clothing.[11]

"The police may lawfully seek and obtain a search warrant for an investigatory search for which it has been established that there is probable cause to believe that the objects sought constitute evidence of a crime and are located at the site to be searched. . . . Probable cause to search exists if: (1) there is probable cause to

[11] The search warrant also authorized the police to seize light colored, synthetic fibers from the carpeting in the defendant's home for comparison to similar fibers discovered on the victim's clothing. Upon execution of the search warrant, the police seized carpet fibers that matched those on the victim's clothing. Prior to trial, the defendant moved to suppress all of the evidence seized from his home, including the synthetic fibers, and the trial court denied the defendant's motion. On appeal, however, the defendant challenges the seizure of only the wood particles.

believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Findings of probable cause do not lend themselves to any uniform formula because probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. . . .

"In determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . We view the information in the affidavit in the light most favorable to upholding the magistrate's determination of probable cause. . . . In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [issuing judge's] determination. . . . Furthermore, it is axiomatic that [a] significantly lower quant[um] of proof is required to establish probable cause than guilt. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Vincent*, 229 Conn. 164, 171–72, 640 A.2d 94 (1994).

"The determination of probable cause to conduct a search depends in part on the finding of facts so closely related to the time of the issuance of the warrant as to justify a belief in the continued existence of probable cause at that time. *State* v. *Rose*, 168 Conn. 623, 631, 362 A.2d 813 (1975). Although it is reasonable to infer that probable cause dwindles as time passes, no single rule can be applied to determine when information has become too old to be reliable." *State* v. *Johnson*, 219 Conn. 557, 566, 594 A.2d 933 (1991). Consequently,

whether a reasonable likelihood exists that evidence identified in the warrant affidavit will be found on the subject premises is a determination that must be made on a case-by-case basis. Accordingly, we have refused to "adopt an arbitrary cutoff date, expressed either in days, weeks or months, beyond which probable cause ceases to exist." *State* v. *Vincent,* supra, 229 Conn. 175. Moreover, we have recognized that "[i]f items of property are innocuous in themselves or not particularly incriminating and are likely to remain on the premises, that fact is an important factor to be considered in determining the staleness of a warrant."[12] *State* v. *Carbone,* 172 Conn. 242, 251, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977).

Although the affiants had observed the sawdust and wood particles in the defendant's garage more than three months prior to the issuance of the warrant, the nature of that evidence is such that it was reasonable for the issuing magistrate to have concluded that some or all of it would still be there when the search warrant was sought. Unlike contraband, sawdust and wood particles are innocuous and, consequently, unlikely to instill suspicion or concern; it is therefore improbable

---

[12] Thus, "[t]he likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), or the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning [service] has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed. *Andresen* v. *State,* 24 Md. App. 128, 172, 331 A.2d 78 (1975), aff'd, 427 U.S. 463, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976); see also *Sgro* v. *United States,* 287 U.S. 206, 211, 53 S. Ct. 138, 77 L. Ed. 260 (1932); 2 W. LaFave, Search and Seizure (2d Ed. 1987) § 3.7 (a), pp. 74–88." (Internal quotation marks omitted.) *State* v. *Vincent,* supra, 229 Conn. 174–75; *State* v. *Johnson,* supra, 219 Conn. 566–67.

that the defendant would have taken unusual or extraordinary measures to attempt to cleanse the garage of all such evidence. Moreover, it is unlikely that even a thorough cleaning of the garage would have eliminated all traces of the sawdust and wood particles from the premises. Thus, the affidavit reasonably supported a determination that wood particles were likely to be found in the defendant's garage despite the fact that the police had observed such evidence there more than three months earlier.

Furthermore, the information set forth in the affidavit established that the wood comprising the deck was identical in kind to the wood particles observed by the police in the defendant's garage, and that the deck was seen on the defendant's premises just three days before the affiants submitted the warrant application. The affidavit recounted the defendant's acknowledgment that his construction of the deck, which was observed by police at the rear of the defendant's home on May 5, 1992, was the source of the sawdust and wood particles that the police had observed in his garage on the day of the victim's murder. Thus, because the affidavit set forth a sufficient link between the wood fragments found on the victim's clothing and the wood particles observed by the police in the defendant's garage, the issuing magistrate reasonably could have concluded that a search of the defendant's premises was likely to reveal wood samples from the deck identical to those found on the victim's clothing. Accordingly, the defendant's staleness claim is without merit.

### III

The defendant also claims that the trial court improperly prohibited him from presenting the testimony of certain witnesses in violation of his right to present a defense as guaranteed by the sixth and fourteenth

amendments to the United States constitution.[13] The defendant contends that the trial court improperly precluded: (1) the testimony of Norman Chase, an attorney, regarding the interaction between the victim and the defendant at the closing on their purchase of a new home one month prior to the murder; (2) the testimony of John Bova, Jr. (John Bova), the defendant's brother, regarding certain statements that the defendant allegedly made to him during a telephone conversation between the two men on the evening of the murder; and (3) videotapes depicting the defendant, the victim, their child and other family members celebrating the Thanksgiving and Christmas holidays in 1991. We conclude that the trial court did not abuse its discretion in excluding such evidence and, therefore, we reject the defendant's constitutional claims.

A

The defendant sought to introduce the testimony of Chase, the attorney who had represented the victim and the defendant at their house closing on December 27, 1991, to show that the couple appeared to enjoy a warm relationship on that date, approximately one month prior to the victim's death. Although Chase's knowledge of the couple's relationship was based solely on his observation of their interaction at the closing, the defendant maintained that it was relevant to rebut the state's evidence that their marriage was a troubled one. The state objected to Chase's testimony regarding the couple's conduct toward one another on the day of the closing on the ground that such testimony lacked

---

[13] The sixth amendment to the United States constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." This right is applied to the states under the due process clause of the fourteenth amendment to the United States constitution. *Washington* v. *Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); see *State* v. *McKnight*, 191 Conn. 564, 580–81, 469 A.2d 397 (1983).

probative value in view of the extremely limited nature of Chase's contact with the couple. The trial court sustained the state's objection, noting also that the jury was aware of the fact that the defendant and the victim had reconciled, and that they had purchased a home together shortly before the victim's death.

"When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. *Chambers* v. *Mississippi*, [410 U.S. 284, 289–90, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)]. A defendant is, however, bound by the rules of evidence in presenting a defense. *State* v. *Kelly*, 208 Conn. 365, 375–76, 545 A.2d 1048 (1988). Although exclusionary rules of evidence should not be applied 'mechanistically' to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. *Chambers* v. *Mississippi*, supra, 302. If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded. *State* v. *Mastropetre*, [175 Conn. 512, 521, 400 A.2d 276 (1978)]; *State* v. *Cassidy*, [3 Conn. App. 374, 383, 489 A.2d 386, cert. denied, 196 Conn. 803, 492 A.2d 1239 (1985)]." *State* v. *Christiano*, 228 Conn. 456, 474, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994).

The trial court did not abuse its discretion in excluding the proffered testimony on relevance grounds. Chase had no special knowledge of the couple's relationship, and his observation of their interaction was limited to a few hours on a single day more than one month prior to the victim's murder. The trial court, therefore, reasonably concluded that Chase's testimony regarding the couple's demeanor on that one, isolated occasion proved nothing about the nature of their relationship. Moreover, the jury already knew that the couple's marital difficulties appeared to have subsided. The defendant's claim is, therefore, without merit.

## B

The defendant next claims that the trial court improperly precluded him from presenting testimony by his brother, John Bova, regarding the specific statements that the defendant allegedly made during a telephone conversation between the two men on the evening of the murder. The following additional facts are necessary to our resolution of this claim.

John Bova testified without objection that the defendant had telephoned him between approximately 8 and 8:30 p.m. on January 29, 1992, to discuss a problem that the defendant was having with the converter box of his cable television system. The defendant then asked John Bova to explain whether the defendant had stated that his cable system recently had been installed and, further, to repeat everything else that the defendant had said during their conversation. The state objected to the question on hearsay grounds, and the defendant claimed that the proffered testimony was admissible under the state of mind exception to the hearsay rule because it was not being offered to prove the truth of the matter but, rather, as evidence of the defendant's state of mind at the time. The trial court sustained the state's objection. John Bova then testified that his telephone conversation with the defendant lasted approximately fifteen to twenty minutes, that they spoke about the defendant's cable television system and several other topics, and that the defendant sounded calm and normal.

"A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible. *State* v. *Packard*, 184 Conn. 258, 274, 439 A.2d 983 (1981). An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the

truth of the matter asserted. *State* v. *Rollinson*, 203 Conn. 641, 660, 526 A.2d 1283 (1987); *State* v. *Hoeplinger*, 27 Conn. App. 643, 649, 609 A.2d 1015, cert. denied, 223 Conn. 912, 612 A.2d 59 (1992); C. Tait & J. LaPlante, [Connecticut Evidence (2d Ed. 1988)] § 11.3.2." *State* v. *Blades*, 225 Conn. 609, 632, 626 A.2d 273 (1993). We have also indicated that an out-of-court statement introduced to establish the declarant's state of mind nevertheless may be inadmissible if the statement was not made "in a natural manner, in apparent good faith and without reason for fabrication." *General Motors Acceptance Corp.* v. *Capitol Garage, Inc.*, 154 Conn. 593, 598, 227 A.2d 548 (1967); see also C. Tait & J. LaPlante, supra, § 11.13.1, pp. 379–80. Furthermore, the out-of-court statement must be offered exclusively as evidence of the declarant's state of mind. See 6 J. Wigmore, Evidence (4th Ed. 1976) § 1790.

The trial court precluded John Bova from testifying about the details of his telephone conversation with the defendant on the ground that those details were not being offered solely to establish the defendant's state of mind, but also as proof that the defendant was actually repairing his television set at the time that the state asserts he was disposing of the victim's body. We conclude that the trial court properly excluded the details of the defendant's conversation with his brother because that testimony was intended to demonstrate that the defendant was engaged in the innocent activity of repairing his television set at a time when the state alleged that he was involved in criminal activity. Furthermore, John Bova was allowed to testify about the time, length and general nature of the conversation, and the fact that the defendant sounded perfectly normal. In the absence of any indication that the details of the defendant's statements to his brother bore any special relevance to his state of mind, and in light of the testimony that the defendant was allowed to adduce regard-

ing the general nature, length and tenor of the telephone conversation,[14] we reject the defendant's claim that the trial court improperly limited John Bova's testimony concerning his discussion with the defendant on the evening of the murder.

## C

The defendant also sought to introduce into evidence two videotapes depicting the defendant, the victim and their families celebrating the Thanksgiving and Christmas holidays in 1991. After reviewing the videotapes, the trial court determined that the prejudicial effect of the tapes, even in redacted form, outweighed their minimal probative value.

The following additional facts are relevant to this issue. When the victim's body was found in the early morning hours of January 29, 1992, she was wearing only a light sweatsuit despite the fact that the temperature that evening was in the thirties. The evidence also established that the victim was unlikely to have been dressed in such a manner to go shopping, both because she tended to dress somewhat formally and because she was quite sensitive to the cold. In addition, Donofrio testified that shortly after the victim's murder, the defendant had placed his son in an infant seat in Donofrio's car, and that she had transported the child without incident to Bradlees, where she then met the defendant. Finally, the state adduced evidence to establish that the defendant and the victim were experiencing marital problems.

The defendant maintained that the videotapes were relevant to rebut this evidence. Specifically, the defendant claimed that: (1) the sweatshirt that the victim was

---

[14] The defendant made no offer of proof as to why further testimony regarding the details of the statements he allegedly made to his brother during their telephone conversation would have shed any additional light on his state of mind at that time.

wearing when her body was discovered could be observed hanging on a chair in the defendant's parents' home in the Thanksgiving Day videotape; (2) the Christmas Day videotape revealed that the victim was wearing a light dress on that occasion; (3) the tapes indicated that the couple's child was too large to have fit comfortably into an infant seat and that, in view of the child's "size and stage of development," he was not likely to have been cooperative with Donofrio's efforts to transport him to Bradlees; and (4) the tapes depicted the defendant and the victim as part of a happy, normal family.

The trial court viewed the videotapes and concluded that their minimal probative value was outweighed by their overriding prejudicial effect. In particular, the trial court noted that the scenes captured on the tapes were likely to elicit undue sympathy for the child, the defendant *and* the victim. The trial court further indicated that the defendant was free to rebut the state's evidence through other means, stating that testimony by witnesses familiar with the defendant's son and with the manner in which the victim dressed could provide more accurate information regarding those issues than could be gleaned from the videotapes. The court further noted that: (1) a review of the videotapes indicated that the child appeared small enough to fit into an infant seat; (2) the presence of the victim's sweatshirt at the home of the defendant's parents on Thanksgiving Day lacked relevance because there was no indication that the sweatshirt was the only outer garment worn by the victim that day;[15] and (3) the fact that the victim and the defendant appeared to be enjoying the holidays was largely irrelevant to the issue of the nature of their relationship.[16]

---

[15] Moreover, although there was no testimony as to the weather on Thanksgiving Day, a voice off camera can be heard to state that it was 45 to 50 degrees Fahrenheit outside.

[16] We note that although the Christmas Day videotape captures the defendant and the victim seated on a couch next to one another for a period of time,

The trial court has broad leeway to determine the admissibility of photographs and videotapes based upon a balancing of the probative value of such evidence against its likely prejudicial effect. See, e.g., *State* v. *Deleon*, 230 Conn. 351, 369, 645 A.2d 518 (1994); *State* v. *Williams*, 227 Conn. 101, 111, 629 A.2d 402 (1993). In the present case, the trial court reviewed the videotape evidence and reasonably concluded that it was essentially irrelevant and potentially prejudicial both to the state *and* to the defendant. Moreover, the court did not preclude the defendant from adducing other evidence to prove those facts that he sought to establish through the videotapes; indeed, the trial court encouraged the defendant to do so, indicating that such evidence was both readily available and more probative of those issues than the videotapes. We conclude, therefore, that the trial court did not abuse its discretion in prohibiting the defendant from introducing the videotapes into evidence.

IV

The defendant next claims that certain comments by the state during its closing argument to the jury violated his due process right to a fair trial. We disagree.

The following facts are relevant to the defendant's claim of prosecutorial misconduct. The state's evidence indicated that the defendant was motivated to kill the victim by financial and romantic considerations. Specifically, the defendant and his brother had borrowed approximately $180,000 from their parents to start a business that ultimately failed. At the time of the murder, the defendant was working in a grocery store and making monthly payments of over $500 to his parents. Furthermore, the defendant was the primary beneficiary of two insurance policies owned by the victim

there was very little interaction of any kind between the couple depicted on either of the two videotapes.

totaling $296,900. In addition, the evidence indicated that the defendant knew that a divorce would be costly, and the defendant's brother-in-law testified that the defendant told him that the defendant could not afford a divorce.

The state also presented evidence showing that the defendant's romantic relationship with Donofrio was both intense and longstanding. That evidence indicated that the defendant and Donofrio began their relationship in 1985, just one month before she married another man, with the defendant serving as the best man and the victim as a bridesmaid at the wedding. The defendant had also secured a job for Donofrio at his place of employment so that he could be close to her during the day.

The state began its closing argument as follows: "This is a case of greed and about lust. This is a case about Mark Bova. This is a case about a man who couldn't get out of a failing marriage. This is about a man who couldn't pay a massive loan to his parents. This is a case about a man who couldn't afford to get divorced. This is about a man who took his wife's neck in his own hands and strangled her to death. Ladies and gentleman of the jury, there is one person in the world who had the motive, the opportunity and the means to kill [the victim] and the evidence shows beyond any reasonable doubt, that that one person who had all three of those is Mark Bova." The state then undertook a detailed analysis of the evidence, focusing on the defendant's motive to kill the victim, his opportunity to do so, and the method employed to commit the murder.

The defendant, in his closing argument, launched a powerful attack on the state's evidence and, in particular, on Donofrio's credibility, asserting that the case was not about lust but, rather, about "[Donofrio's] obsession with a man to the point that if she couldn't have him,

*nobody would.*" During a lengthy rebuttal argument, the state sought to address the points made by the defendant in his summation, and concluded as follows: "This is the husband of the week, father of the year, [b]est [m]an, best friend of the decade. This is the person with the motive, the opportunity, and the method. This is the man who has greed and has lust. And, ladies and gentlemen of the jury, this is a crime about greed and about lust on both their parts. But for you, twelve men and women firm and true, with a great responsibility, this is a case about justice."[17] The trial court then excused the jury and recessed for lunch. After the lunch recess, the defendant expressed his concerns about the state's ironic description of the defendant as "husband of the week" and "father of the year," and requested that the jury be admonished to disregard those comments.[18] The trial court denied the defendant's request for a curative instruction. On appeal, the defendant claims that the state's comments about the defendant's greed and lust, and its sarcastic description of the defendant as a model father and husband, were improper, and so tainted the trial as to render it unfair.

While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. See, e.g., *State* v. *Oehman,* 212 Conn. 325, 336, 562 A.2d 493 (1989); *State* v. *Williams,* 204 Conn. 523, 537–38, 529 A.2d 653 (1987); *State* v. *Couture,* 194 Conn. 530, 564, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Consequently, the state must "avoid arguments which are calculated to influence the passions or prejudices

[17] Earlier in its rebuttal argument, the state had used similar language in characterizing the defendant, referring to him as the "best friend of the century, the [b]est [m]an," the "father of the year" and the "husband of the decade."

[18] The defendant never objected to the state's characterization of the case as one involving the defendant's greed and lust.

of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence." *State* v. *Carr*, 172 Conn. 458, 470, 374 A.2d 1107 (1977); see also *State* v. *Williams*, supra, 538. Such "[a]n appeal to emotions may arise directly, or indirectly from the use of personal and degrading epithets to describe the defendant"; *State* v. *Williams*, supra, 545; and a defendant's right to a fair trial may be abridged by the repeated or flagrant use of such invective. Id., 545–46; *State* v. *Couture*, supra, 564.

In determining the propriety of a prosecutor's allegedly improper closing argument, we are mindful that statements that appear to be inflammatory when analyzed in isolation may not be unfair or unduly prejudicial when viewed in the context of the entire case. See *State* v. *Oehman*, supra, 212 Conn. 336. Because the trial court is in the best position to evaluate the propriety of such remarks, we afford deference to the trial court's decision whether to grant a request for curative instructions sought to protect the defendant from the allegedly intemperate or provocative prosecutorial comment. See *State* v. *Ruscoe*, 212 Conn. 223, 248–49, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

In this case, the state's remarks regarding the defendant's lust and greed were fully supported by the evidence; indeed, the jury reasonably could have concluded that such lust and greed provided the defendant with sufficient motive to kill the victim. Although it may be argued that the state's ironic characterization of the defendant as a good husband and father was unnecessarily caustic, it cannot be said that the comments were without support in the record. The challenged remarks were relatively isolated and brief, they did not reflect a pattern of misconduct, and they did

not implicate the fairness of the defendant's trial. See *State* v. *Chance,* supra, 236 Conn. 64. Accordingly, we reject the defendant's claim that he is entitled to a new trial due to the state's allegedly improper remarks in its closing argument.

## V

The defendant's final claim is that the evidence was insufficient to support his conviction of the crime of conspiracy to commit murder.[19] Specifically, the defendant contends that the state failed to establish beyond a reasonable doubt that he had agreed with another person to murder the victim. This claim is without merit.

"In reviewing the defendant's [claim] of evidentiary insufficiency, '[w]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.' *State* v. *Sivri,* 231 Conn. 115, 126, 646 A.2d 169 (1994)." *State* v. *Diaz,* 237 Conn. 518, 541, 679 A.2d 902 (1996). "To establish the crime of conspiracy [to commit murder in violation of §§ 53a-54a and 53a-48, the state must show] that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . While the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be

---

[19] The defendant does not challenge the sufficiency of the evidence with respect to his murder conviction.

inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Taylor*, 239 Conn. 481, 495–96, 687 A.2d 489 (1996).

In accordance with these principles, we conclude that the evidence amply supported the jury's determination that the defendant and Donofrio conspired to murder the victim. Donofrio testified that the defendant had told her of his plans to kill the victim several days before the murder, that he had called her while he was in the process of killing the victim and enlisted her help in completing the deadly undertaking, and that, in response to the telephone call, she had traveled immediately to the defendant's home and assisted him in fatally suffocating the victim with a pillow. Donofrio's version of the events was supported by forensic and other circumstantial evidence. Accordingly, we conclude that the state's evidence was sufficient to establish that the defendant was guilty of the crime of conspiracy to commit murder.

The judgment is affirmed.

In this opinion the other justices concurred.