[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant, Deowraj Buddhu, has moved this Court to suppress the evidence that was seized pursuant to a search and seizure warrant dated November 21, 1995 (hereinafter "the warrant"), and which the state seeks to use against him in the above-captioned case.[1] The defendant claims that the evidence was seized in violation of his constitutional right to be free from unreasonable search and seizure as guaranteed by the Fourth,Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Constitution of the State of Connecticut.[2] Specifically, the defendant claims that 1) the warrant affidavit and application failed to establish probable cause to believe that the items sought would be found at 958 Broad Street, Hartford, Connecticut; and 2) that the search warrant was defective because it failed to describe with sufficient particularity the place to be searched as constitutionally required. See, Defendant's Memorandum p. 4. For the following reasons, the defendant's motion to suppress is granted.
 PROCEDURAL BACKGROUND
On November 21, 1995, Detective Henry J. Dodenhoff and Detective Charles Hedeen of the Rocky Hill Police Department, CT Page 13994 applied for a search warrant to search the premises of 958 Broad Street in Hartford, identified as the residence of Satesh and Deowraj Buddhu, in connection with allegations of Larceny in the first degree, a violation of Connecticut General Statutes §53a-122, and Forgery in the second degree, a violation of General Statutes § 53a-139.[3] According to the warrant affidavit, an investigation into these matters began on November 17, 1995, when a Bank of New York investigator contacted the Rocky Hill police department about the illegal negotiation of two forged checks in the greater Hartford area. The investigation led the police to the suspect Michael Casati.[4] Casati then supplied the information which led the police to the Buddhus.
According to Casati, Satesh Buddhu approached him about the check cashing scheme. Casati told the police that Satesh lived with his father at 958 Broad Street. A query of the Motor Vehicle Department confirmed that both Satesh and Deowraj Buddhu held valid drivers' licenses listing their home addresses as 958 Broad Street. The police also recovered from Michael Casati a business card for Phoenix Consulting with the name "Deo" and the address 958 Broad Street. Affidavit, ¶ 9. The issuing magistrate found probable cause and signed the warrant authorizing the search.
The defendant, Deowraj Buddhu, was arrested on January 22, 1999, on a 140-count information.[5] A substitute information and bill of particulars were filed on June 10, 1999, charging the defendant with 142 violations of the penal code.[6] On April 26, 1999, pursuant to the Fourth, Fifth, Sixth andFourteenth Amendments to the United States Constitution, General Statutes §54-33f,[7] and Practice Book §§ 41-12 et seq.,[8] the defendant moved this Court to suppress evidence seized from his home and home-office on November 22, 1995, pursuant to the search warrant dated November 21, 1995.
A hearing was held in conjunction with this motion on September 14, 16, and 17 of 1999, before the Court, Espinosa, J.
Detective Dodenhoff, who was one of the warrant affiants and was present during the execution of the warrant, testified. Sergeant Ardo Rossi, who supervised the execution of the warrant, testified. Urmila S. Thakur, the defendant's ex-wife and former owner of the subject property at 958 Broad Street in Hartford, testified. The defendant and the state filed simultaneous post-hearing briefs on September 22, 1999.[9] In response to the defendant's post-hearing brief, the state filed a supplemental post-hearing brief on September 27, 1999.[10]
CT Page 13995
 FACTS
The Court finds the following facts to have been established at the suppression hearing.[11]
The warrant at issue directed the police to search only, "958 Broad Street," the residence of Satesh and Deowraj Buddhu. Although the building was an apartment building, the warrant failed to identify the address as that of a multi-occupancy dwelling. There was no floor number identified nor any particular subunit number listed in the warrant. Detective Dodenhoff, however, was aware from his interview with Michael Casati that the building was a multi-occupancy building. Dodenhoff also knew that the building was a multi-occupancy dwelling because he drove by the building after his interview with Casati to confirm the building's appearance and location. Dodenhoff did not, however, make a close examination of the building or enter it to determine how many units were in the building and in which unit the Buddhus lived. Instead, he relied on information he received from Casati that the Buddhus lived together on the third floor.
On November 22, 1995, the Rocky Hill police, in conjunction with the Hartford police, conducted a search of 958 Broad Street, Apt. C-2 and 960 Broad Street, Apt. C-1. Apartment C-1, at 960 Broad Street, was the residence of Satesh Buddhu, the defendant's son, his sister Sunita Buddhu and his mother Urmila Buddhu Thakur. The apartment C-2 at 960 Broad Street was the residence of the defendant, Deowraj Buddhu. Both apartments were on the third floor of the building 958-960 Broad Street. The apartments were not identified by either numbers on their doors, or the numbers were not visible when the search was conducted. The search was supervised by Sergeant Rossi and Detective Dodenhoff was also present.
When the police arrived at the third floor, they were faced with two doors, one on the left and one on the right. They knocked on the left door and it was answered by Satesh Buddhu. The officers conducted a protective sweep of the apartment which contained a living room, a kitchen, two bedrooms and a bathroom. The officers then asked Satesh Buddhu where his father was. Satesh told the officers that he was elsewhere in the building. When asked by the police where Deowraj's room was, Satesh said that it was in the right-hand unit. The police then asked Satesh if he had a key to the door and Satesh said that he did not have CT Page 13996 one. After the police threatened to break down the door, Satesh produced a key and let the officers into the unit on the right. Once inside, the officers conducted a protective sweep of the apartment which contained an office, a kitchen, a bedroom and a bathroom. A full search was then conducted of both the left and the right-hand units. During the search, the defendant showed up at the right-hand unit and stated that the office area was his.
The units that were searched were not connected by an internal door. It was not possible to enter one apartment and then pass into the other without first leaving the original unit that was entered. The units had individual electric meters and gas meters. Each unit had its own door bell as well. Though they had one phone line in common, each unit also had its own phone line. The two units together made up the entire third floor of the apartment building 958-960 Broad Street. There was a total of six units in the building — two on each of the three floors. Pursuant to the search of the two units, all of the relevant documentary evidence was seized from apartment C-2, which was the unit on the right.[12]
 DISCUSSION
I. PROBABLE CAUSE
 A. The residence
The defendant's first claim is that the warrant affidavit and application failed to establish probable cause to search the defendant's residence. The defendant argues that Dodenhoff's and Hedeen's claim that there was probable cause to search the defendant's residence was based solely on surmise and conjecture.See, Defendant's Memorandum, pp. 4-10. The defendant also argues that the information relied upon by the affiants in support of their application to search the defendant's residence was stale.Id., 10-12.[13]
It is axiomatic that "[u]nder both the federal and state constitutions, the police must first obtain a warrant before conducting a search, unless an exception to the warrant requirement applies. See Katz v. United States, 389 U.S. 347,357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (warrant required before every search or seizure, `subject only to a few specifically established and well-delineated exceptions' [internal quotation marks omitted.]); State v. Badgett, 200 Conn. 412, 423, CT Page 13997512 A.2d 160, cert. denied, 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373
(1986)." State v. Longo, 243 Conn. 732, 737, 708 A.2d 1354
(1998). "`The police may lawfully seek and obtain a search warrant for an investigatory search for which it has been established that there is probable cause to believe that the objects sought constitute evidence of a crime and are located at the site to be searched . . . . Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . .
`Findings of probable cause do not lend themselves to any particular formula because probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily or even usefully, reduced to a neat set of legal rules . . . . In determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . Furthermore, it is axiomatic that a significantly lower quanta of proof is required to establish probable cause than guilt . . . .' (Citations omitted; internal quotation marks omitted.) State v. Vincent, 229 Conn. 164,171-72, 640 A.2d 94 (1994)." State v. Bova, 240 Conn. 210,231-32, 690 A.2d 1370 (1997).
"The standards for upholding a search warrant are well established. [The reviewing Court will] uphold `the validity of the warrant . . . if the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed.' (Internal quotations marks omitted)State v. Duntz, 223 Conn. 207, 215, 613 A.2d 224 (1992). `The magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a Court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate. Where the circumstances for finding probable cause are detailed, where a substantial basis for crediting the course of information is apparent, and when a magistrate has in fact found probable cause, the reviewing Court should not invalidate the warrant by CT Page 13998 application of rigid analytical categories.' State v. Barton,219 Conn. 529, 544-45, 594 A.2d 917 (1991). [The reviewing Court is] also reminded that `in a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the magistrate's determination.' State v. Johnson, 219 Conn. 557, 565,594 A.2d 933 (1991); see also State v. DeFusco, 224 Conn. 627, 642,620 A.2d 746 (1993). Lastly it is well established that, in reviewing a search warrant affidavit, `the reviewing Court may consider only the information that was actually before the issuing judge at the time he or she signed the warrant.' (internal quotation marks omitted.) State v. Shifflett, 199 Conn. 718, 746,508 A.2d 748 (1986). In the absence of a showing that the information contained in the warrant is false or misleading or that there is a material omission from the affidavit; see Franks v. Delaware,438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); a hearing on a motion to suppress is limited to a review of the four corners of the affidavit. State v. Diaz, 226 Conn. 514, 543-44 n. 16, 628 A.2d 567 (1993)," (footnotes omitted.) State v. Rosario,238 Conn. 380, 385-86, 680 A.2d 237 (1996).
With due deference to the findings of the issuing magistrate, it is the finding of this Court, that the warrant affidavit failed to establish that there was probable cause to believe that the objects sought in the warrant would be located at 958 Broad Street, the residence of Satesh or Deowraj Buddhu.
On November 21, 1995, Rocky Hill Police Detectives Dodenhoff and Hedeen applied for a search and seizure warrant for what they believed to be the residence of Satesh Buddhu and Deowraj Buddhu. According to the warrant application, on November 17, 1995, the Rocky Hill Police Department received information from Bank of New York investigator, Gary E. Gaudioso, that two forged checks had been negotiated in the greater Hartford area. Affidavit, ¶¶ 2, 3, 4, 5, 8D, 8M. As a result of an ensuing investigation, a search and seizure warrant was issued for, and executed on, the person, residence and vehicle of twenty year-old, Michael Casati of Rocky Hill. Affidavit, ¶¶ 5, 6. Also on November 20, 1995, Michael Casati was interviewed by Rocky Hill police during which interview Casati acknowledged his involvement in the negotiation of the two aforementioned checks and identified Satesh Buddhu as the person who propositioned him to take part in the negotiation activities. Affidavit, ¶¶ 7, 8, 8A, 8B, 8C.
Casati stated during his interview that Satesh Buddhu was an CT Page 13999 old high school friend who offered to pay him $1,000.00 to deposit into his account money provided by Satesh and then make withdraws when directed to do so. Affidavit, ¶ 8C. According to Casati, beginning sometime in August or September 1995, Satesh would pick him up at work, drive him to the bank, give Casati a check to deposit into his savings account and when that was accomplished, Satesh would drive Casati back to work and hold onto Casati's bank book. On other occasions, Satesh would pick Casati up at work, drive him to the bank, direct him to make withdraws, drive him back to work and then hold onto the bank book and money. For the use of his account Casati was paid the $1,000.00. Affidavit, ¶¶ 8B, 8C, 8D, 8E. These activities were repeated about three or four more times until Satesh left for National Guard Service in Texas. Affidavit, ¶¶ 8H, 8I.
Casati further explained that when Satesh left for the National Guard, Satesh instructed him on how to handle the continued withdraws from his savings account. Affidavit, ¶ 8-I. Casati was to go to the bank every couple of days and make withdraws of less than $10,000.00. He was then to place the money and the bank book in a sealed envelope with the word "Agnani" or "Agani" on the outside of the envelope and give the envelope to Satesh's father.[14] Casati was told not to give the envelope to anyone but Satesh's father, and that someone else would then pick it up. Affidavit, ¶ 8I. Before returning to the bank, Casati was to call Satesh's father at a particular number and then go and pick up a sealed envelope with the name "Mike" written on the outside from Satesh's father. Affidavit, ¶¶ 8I, 8J. Casati explained that he had met Satesh's father when these activities with Satesh began. Affidavit, ¶ 8I. He also stated that Satesh's father owned a business called Phoenix Consulting which he ran out of the home he shared with Satesh at 958 Broad Street in Hartford. Affidavit, ¶ 8A. This procedure with the defendant stopped when Satesh returned from the National Guard. After Satesh returned, Casati maintained contact with Satesh with respect to the banking activity. Affidavit, ¶¶ 8M, 8N, 8O.
Based upon their training and experience, the officers concluded that "[t]he investigation of th[e] complaint indicates Michael Casati, Gregory Roberson, Satesh Buddhu [and perhaps other unidentified person(s)] participated in such a conspiracy." Affidavit, ¶ 11. Dodenhoff and Hedeen then applied for a warrant to search "[t]he residence of SATESH BUDDHU (date of birth 2/6/74) and DEOWRAJ BUDDHU (date of birth 9/18/42), 958 Broad Street, Hartford, CT." See, warrant, p. 1. The warrant further CT Page 14000 stated: "This is also the business location of PHOENIX CONSULTING SERVICES operated by Deo." Warrant, p. 1. The warrant authorized the seizure of, among other things, "[a]ll records of checking and savings accounts including the name of Michael A. Casati, Gregory Roberson and/or Satesh Buddhu . . . ." Warrant, p. 1. To verify that the address listed in the warrant was in fact the address of Satesh and Deowraj Buddhu, the officers ran a records search with the Department of Motor Vehicles which confirmed that each held a valid driver's license listing 958 Broad Street as his residence. Affidavit, ¶ 9. Also, the search of Casati turned up a business card for Phoenix Consulting with the address 958 Broad Street, Hartford, CT, and the name "Deo." Affidavit, ¶ 9.
This Court does not dispute that the warrant affidavit established probable cause "to believe that the particular items sought to be seized [were] connected with criminal activity or [would] assist in a particular apprehension or conviction . . . ." State v. Bova, supra, 240 Conn. 231-32. The affidavit alleged that an official bank investigator reported to the Rocky Hill police that two forged checks had been negotiated. The investigator knew they were forged because the color of the check numbers was black instead of red, the numbers were smaller than on the authentic checks, the numbers were 5,000 digits higher in sequence than the authentic checks and the checks had been signed in black rather than the authorized colors of blue or red. Affidavit, ¶¶ 3, 4, 5. This Court, however, finds that the warrant affidavit failed to establish that "there [was] probable cause to believe that the items sought to be seized [would] be [found] in the place to be searched . . . ."; in this case, the defendant's residence at 958 Broad Street in Hartford. State v.Bova, supra.
Although it was established at the suppression hearing that Satesh and Deowraj Buddhu were not residing together at 958 Broad Street, this Court is limited to a review of the four corners of the warrant affidavit, as presented to the issuing magistrate, in deciding wither there existed probable cause for the issuance of the warrant. Therefore, for now, this Court will consider the issue of probable cause to search the "residence of SATESH BUDDHU . . . and DEOWRAJ S. BUDDHU . . ." at 958 Broad Street as set forth on page one of the warrant, without regard to whether it was the left side or right side apartment on the third floor.[15]
According to the affidavit, prior to Satesh leaving for the CT Page 14001 National Guard, whenever Casati deposited a check or withdrew money from the bank, he was accompanied by Satesh who drove him from work to the bank and then back to work. See e.g., affidavit, ¶¶ 8B-C ["In August or September Satesh asked me if I wanted to make some money. The next time Satesh talked to me about the money . . . we were driving in Satesh's car. . . ." (Emphasis added.)]; ¶¶ 8D-F ["Two or three days later he came to my job . . . He drove me to Peoples Bank. . . . While we wereriding he gave me a check. . . . I went into the bank and Satesh stayed in the car. Satesh brought me back to work . . . he kept my savings book." (Emphasis added.)]; ¶¶ 8G-H ("About a week later Satesh called me. . . . He came by my work . . . he brought me to the same bank. . . . When I got back outside I gave him the money. Satesh kept the bank book and brought me back to work. . . . A few days later. . . . Satesh brought me to the bank . . . ." (Emphasis added.)]. There is no indication in the affidavit that Casati ever met Satesh at his residence to pick up the checks or deliver the money. While it is clear from the affidavit that Casati observed the forged checks and his bank book in Satesh's car, there is no indication in the affidavit that Casati or the affiants ever observed this car at or near Satesh's home. While this information might have provided probable cause to search Satesh Buddhu's car, it did not support probable cause to search the residence which the affiants believed he shared with the defendant.
It is noted that Detectives Dodenhoff and Hedeen averred in the warrant affidavit that their "police investigative training and experience" had "provided them with the knowledge that people who commit white-collar fraud-type crimes" often maintain their records in a place where they feel comfortable and "[a] n area where [a] perpetrator would experience such security would be their residence." Affidavit, ¶ 13. It has also been established that "[t]he nexus between the items sought and the place to be searched may be inferred from the type of crime, the nature of the evidence, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide the item . . .," State v. Martinez, 51 Conn. App. 59, 68,719 A.2d 1213, cert. denied, 247 Conn. 952, 719 A.2d 1175 (1998). However, to conclude that every time a white-collar or fraud related crime is committed, the police are justified in searching for the fruits of those crimes in the alleged perpetrator's home, would violate the most basic protections of the fourth amendment's warrant requirement: that the state must show that "there is a CT Page 14002fair probability that contraband or evidence of a crime will be found in a particular place. . . ." (Emphasis added.) State v.Bova, supra, 240 Conn. 232. While this Court is aware that our law recognizes that "[i]n the case of drug dealers evidence is likely to be found where the dealers live," (Citations omitted),State v. Nazario, 38 Conn. App. 588, 597, 662 A.2d 1313 (1995), the Court is not aware, however, of any case holding similarly with respect to white-collar fraud crimes.
The warrant affidavit does contain the claim by Casati that when Satesh was away in the National Guard, Casati picked up envelopes from Satesh's father and dropped off envelopes with Satesh's father "at Satesh's house." Affidavit, ¶¶ 8I, 8J. This occurred for a period of time and then ceased when Satesh returned. "The determination of probable cause to conduct a search depends in part on the finding of facts so closely related to the time of the issuance of the warrant as to justify a belief in the continued existence of probable cause at that time. Although it is reasonable to infer that probable cause dwindles as time passes, no single rule can be applied to determine when information has become too old to be reliable. Consequently, whether a reasonable likelihood exists that evidence identified in the warrant affidavit will be found on the subject premises is a determination that must be made on a case-by-case basis. Accordingly [our Supreme Court] has refused to adopt an arbitrary cutoff date, expressed either in days, weeks or months beyond which probable cause ceases to exist. Moreover, [our Supreme Court] [has] recognized that if items of property are innocuous in themselves or not particularly incriminating and are likely to remain on the premises, that fact is an important factor to be considered in determining the staleness of a warrant." State v.Bova, supra, 240 Conn. 232-33.
While envelopes, bank books and cash are "innocuous items in themselves" and are ordinarily found in a home, the facts as alleged in the warrant affidavit do not support a finding that these items would have likely been in the defendant's home on November 22, 1995. First, the affidavit states that in the period of time during which the defendant exchanged envelopes with the defendant, the envelopes were always sealed and addressed to people other than the defendant. Second, the affidavit also states that Casati had been informed that the envelopes he dropped off with the defendant would be picked up by someone else. Furthermore, there is no indication in the affidavit that Casati ever discussed the envelopes or their contents with the CT Page 14003 defendant, although it would be reasonable to expect that they would have if they both were involved in the scheme. The most logical conclusions that can be drawn from these facts are that the defendant was not aware of what was in the envelopes, he was not a participant in the negotiation and procurement of what was inside of those envelopes, and he was not to remain in possession of those envelopes and their contents for any extended period of time. The affidavit also states that Casati said the procedure of exchanging envelopes with Satesh's father only occurred two or three times and then all subsequent contact was with Satesh. Affidavit, ¶¶ 8N, 8O. Additionally, the affidavit indicates that Casati told the police that at least one month had passed since he made his last visit to Satesh's father to either drop off or pick up an envelope. Affidavit, ¶ 8M ("Once it was over Satesh didn't mention anything about the money again until a month or so ago.").
Finally, although the warrant affidavit states that Casati would leave envelopes with Satesh's father "at Satesh's house," this statement is conclusory and unsupported by facts. There is no indication from the affidavit that Casati ever entered the home or saw what Satesh's father did with the envelopes. Given the fact that all indicators pointed to the fact that the defendant was not aware of the possible criminal activities that his son was engaged in, and given the fact that the defendant's home was only connected to the fruits of these alleged crimes for a short period of time ending approximately one month prior to the search, the Court finds that there was not sufficient evidence upon which to base a finding of probable cause to search the defendant's residence.
The state argues that "the mere fact that one could possibly conceive of an innocent explanation for conduct that suggests complicity does not require the magistrate passing upon the existence of probable cause to do so." See, State's Memorandum, p. 11. This Court does not dispute that fact. However, this is not a case in which the innocent explanation is unlikely but possible. The logical and reasonable reading of the warrant affidavit and warrant indicates that it is very unlikely that the police themselves believed the defendant was a suspect when they applied for the warrant. While the defendant's name was mentioned on the face of the warrant, the affidavit specifically indicated whom the police suspected of criminal activity: "The investigation of this complaint indicates that Michael Casati, Gregory Roberson, Satesh Buddhu [and perhaps other unidentified CT Page 14004 person(s)] participated in such a conspiracy." (Emphasis added.) Affidavit, ¶ 11. If the police had reason to believe that the defendant was involved in the conspiracy, they could have included his name in this list of suspects. They did not.
Moreover, the warrant itself specifically authorized the seizure of "[a]ll records of checking and savings accounts including the name of Michael A. Casati, Gregory Roberson, and/orSatesh Buddhu. . . ." (Emphasis added.) Warrant, p. 1. Again, had the police suspected that the defendant was involved in the criminal activities, they could have sought authorization to seize his banking records as well. They did not. Therefore, because the affidavit failed to establish a reasonable basis for believing that the defendant was aware of the criminal activities, and because the last transfer of envelopes that occurred through the defendant occurred more than a month before Casati gave his statement to the police, and because there were no other documented connections to the residence, it was unreasonable to conclude that there was probable cause to believe that the fruits of these alleged crimes would be at present at the residence of Satesh Buddhu or the defendant.
 B. The Defendant's Office
This Court also finds that there was no probable cause to believe that the items sought to be seized would be present in the defendant's office, also located in his residence. It is first important to note that, in the Court's view, contrary to the state's claim, the warrant did not authorize a search of the office of Phoenix Consulting. The warrant merely states that it authorizes the officers to "enter into or upon and search the place or thing described in the foregoing affidavit and application, to wit:
 The residence of SATESH BUDDHU (date of birth 2/6/74) and DEOWRAJ S. BUDDHU (date of birth 9/18/42), 958 Broad Street, Hartford, Ct. This is also the business location of PHOENIX CONSULTING SERVICES, operated by Deo [Buddhu]."
WARRANT, p. 1. Had the warrant been intended to authorize a search of the office as well, the warrant would have authorized the officers to "enter into or upon and search the place or thing described in the foregoing affidavit and application, to wit: "The residence of . . ., and the office of Phoenix ConsultingServices, operated by Deo Buddhu and located at the same CT Page 14005 address." Nevertheless, the Court will address the argument that there was probable cause to search the office because it was in fact searched and the state in its brief argues "that there was probable cause to believe that evidence or fruits of a crime were in the defendant's residence or office." (Emphasis added.) State's Memorandum, p. 13.
According to the affidavit, Casati told the police that Satesh lived with his father at 958 Broad Street in Hartford, and that Satesh's father owned a business named Phoenix Consulting Services which was operated from their home. Affidavit, ¶ 8A. He further explained that when he would go to pick up his bank book from the defendant when Satesh was away with the National Guard, he would contact the defendant by calling his office phone number. Affidavit, ¶¶ 8I, BJ. Casati would then go and pick up the bank book from the defendant. After making a withdrawal, he would return to the defendant a sealed envelope with the money and bank book. Affidavit, ¶¶ 8I, 8J. The only other reference to the office in the affidavit is a statement that pursuant to the search of Michael Casati, a business card for Phoenix Consulting was recovered. Warrant Affidavit, ¶ 9.
However, there is no indication in the affidavit that Casati met with the defendant in his office in order to pick up the envelopes. There is no indication that Casati had ever been in the office. There is no indication in the affidavit that Casati or the affiants observed the defendant put the envelopes or other fruits of the alleged crimes into his office. There is no indication in the affidavit that Casati or the affiants heard from anyone else that the defendant stored the envelopes he received in his office. There is no indication in the affidavit that Satesh ever worked in his father's office or used it to store his personal belongings. Casati's phone call to the defendant's office to tell the defendant that he needed to come pick up an envelope does not, by itself establish probable cause to believe that the envelopes or their contents were ever located in the office. State v. DeChamplain, 179 Conn. 522, 532,427 A.2d 1338 (1980).
The state also argues that there was probable cause to search the office because Phoenix consulting provided the defendant and/ or Satesh Buddhu, who lived there with the defendant, with the means of carrying out the alleged financial crimes. According to the state, the information provided by the Bank of New York investigator — that the forged checks were of high quality — CT Page 14006 "made the likelihood of an accomplice with a financial background more likely." State's Memorandum, p. 12. Moreover, argues the state, the "preparation of such sophisticated forgeries typically would involve items such as one would find in an accountant financial planner's office: computers, printers, check writers, and reproduction equipment, such as photocopiers." Id. Because either the defendant (an accountant financial planner), in conjunction with Satesh Buddhu or Satesh Buddhu alone, could have used the office and equipment to produce counterfeit checks, the state concludes that there was probable cause to search the defendant's office.
The Court agrees that an office such as that described could be used to create counterfeit checks. However, the fact that the office might have contained the sought after reproduction equipment, alone, was not enough to establish probable cause to search the office. "[M]ere suspicion . . . [or] even strong reason to suspect is not sufficient to constitute probable cause. . . ." State v. Duntz, supra, 223 Conn. 220. The office needed to be linked in some way to the alleged criminal activities. But, as the Court already explained, the affidavit failed to establish probable cause to believe that the defendant himself was involved in the criminal activities. Therefore, if the defendant was not involved, the only other person who could have been using the office to carry out the criminal activities was Satesh Buddhu. The state itself argues that "[t]he innocence of the defendant would not have been inconsistent with the issuance of the warrant,[16] since Satesh Buddhu could have used his father's office and equipment to produce the counterfeit checks without his knowledge." (Footnote added.) See, State's Memorandum, p. 13. Again, while the Court does not dispute the fact that Satesh Buddhu "could have" used his fathers office and equipment to produce the counterfeit checks, without some sort of evidence linking Satesh's alleged activities to the office, or even the residence, probable cause to search the office cannot be established.
A review of the warrant affidavit reveals no links between Satesh Buddhu and the residence or office with the exception that he supposedly lived with his father who maintained an office in their home. There is no claim in the affidavit that either of the affiants or Casati ever saw the layout of the apartment. There is no claim that in the affidavit that either of the affiants or Casati knew if the office was self contained or was just a desk in an unlocked room. There is no claim in the affidavit that CT Page 14007 Satesh Buddhu had access to the office, even though it was located in the apartment he shared with the defendant. Presuming that the defendant was unaware of the criminal activities that his son was allegedly involved with (as is the only reasonable presumption in light of the facts alleged in the affidavit) it would be illogical to believe that Satesh would have stored the fruits of his criminal activities in his father's office who was unaware of the fact that these activities were occurring. Thus, in the event that the warrant was intended by the issuing magistrate to authorize the search of the defendant's office, this Court finds that such a finding was erroneous. There were no facts alleged in the affidavit, sufficient to establish probable cause to believe that the items to be seized would be found in the office of Phoenix Consulting Services.
This Court recognizes that "`in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, and that their determination of probable cause should be paid great deference by reviewing courts.' Nonetheless, the distinction between probable cause and mere conjecture still exists. `The grounds for a search must satisfy objective standards which ensure that the invasion of personal privacy is justified by legitimate governmental interests.'" State v.DeChamplain, supra, 179 Conn. 533. Although one may have surmised that there was a chance that evidence of these crimes might have been found at the residence (or office) of the defendant, such conjecture did not rise to the level of probable cause to believe that the evidence was, in fact, located there. Thus, because the warrant failed to establish probable cause to search the defendant's residence and office, the warrant was invalid.
II. PARTICULARITY
 A. The Warrant
The defendant also claims that the search warrant did not describe the place to be searched with adequate particularity. The crux of the defendant's argument rests on the fact that the place to be searched was an apartment within a multi-occupancy dwelling. The address listed in the warrant affidavit and in the search warrant as the place to be searched was 958 Broad Street. Affidavit, p. 1; Warrant, p. 1. The address, as listed, failed to identify which, if any, apartment was to be searched, what floor that apartment was on, and what unit number was used to identify CT Page 14008 that apartment.
The evidence adduced at the suppression hearing revealed that the defendant's address was not 958 Broad Street, but rather, 960 Broad Street, apartment C-2, and that Satesh Buddhu was in fact residing at 960 Broad Street, apartment C-1. It was also revealed at the suppression hearing, that the addresses 958 Broad Street and 960 Broad street correspond to the same building — an apartment building. Urmila Thakur, the defendant's ex-wife and the owner of the building at the time of the search, testified that the correct address of the building is 958-960 Broad Street. At the hearing, the defense produced a copy of the general warranty deed for the property. It identified the address of the building as 958-960 Broad Street. See, Defendant's Exh. "I".
Urmila Thakur also testified that inside the apartment building are six subunits identified as A-1 and A-2 on the first floor, B-1 and B-2 on the second floor, and C-1 and C-2 on the third floor. The apartments which correspond with the address 958 Broad Street are A-2, B-2 and C-2. The apartments which correspond with the address 960 Broad Street are A-1, B-1 and C-1. However, while the numbers 958 and 960 serve as addresses for units in the same building, the property at 958-960 Broad Street was in fact one physically distinct building. It was not attached to any other building by a catwalk or bridge and, therefore, there was no risk that the police would search the wrong unit because they entered the wrong building. Pursuant to the issuance of the search warrant, both 958 Broad Street, Apartment C-1 and 960 Broad Street, Apartment C-2 were searched.
Connecticut recognizes "`The requirement of thefourth amendment as precluding the issuance of a search warrant that does not adequately describe the premises to be searched. However, "if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended" this mandate is satisfied. Steele v.United States No. 1, 267 U.S. 498, 503, 45 S.Ct. 414, 69 L.Ed. 757
(1925); State v. Abbott, [5 Conn. App. 441, 447, 499 A.2d 437
(1985)]. The warrant's description of the premises "need only define the search with practical accuracy" which is satisfied if it tells the executing officers where to go and what to enter.United States v. Fitzmaurice, 45 F.2d 133, 135 (2d Cir. 1930).
"`A search warrant directed against a multiple-occupancy structure, as here, will be deemed valid if it describes "the CT Page 14009 particular subunit to be searched with sufficient definiteness to preclude a search thereunder of other units located in the larger structure and occupied by innocent persons." Annot., 11 A.L.R.3d 1330, 1333 (1967); United States v. Bedford, 519 F.2d 650,654-55 (3d Cir. 1975), cert. denied, 424 U.S. 917,96 S.Ct. 1120, 47 L.Ed.2d 323 (1976); State v. Abbott, supra, 447. A more particular description obviously lessens the likelihood of a general search of such a structure.'" State v. Vilalastra,9 Conn. App. 667, 672, 521 A.2d 170 (1987). "The particularity requirement will be met by including the correct address of the building and by naming the individual whose apartment is to be searched. See United States v. Bedford, supra." State v. Burgos,7 Conn. App. 265, 269, 508 A.2d 795 (1986).
The search warrant at issue in this case authorized the police to search "[t]he residence of SATESH BUDDHU (date of birth 2/6/74) and DEOWRAJ S. BUDDHU (date of birth 9/18/42), 958 Broad Street, Hartford, Ct. This is also the business location of PHOENIX CONSULTING SERVICES, operated by Deo." Warrant, p. 1. At first blush, it appears as if the warrant satisfies the particularity requirements set out in Burgos and Vilalastra. It lists the address of the building to be searched and it "identifies the unit" by describing who lives in the unit. See e.g., State v. Burgos, supra, 7 Conn. App. 269. However, the Court now knows, with the benefit of hindsight that the description of the place to be searched was overbroad because it was based on a mistaken belief that there was only one residence on the third floor of the building at 958 Broad Street and both the defendant and Satesh Buddhu lived there together. In fact, there were two residences. Satesh Buddhu, Sunita Buddhu and Urmila Buddhu Thakur resided in apartment C-1 and the defendant resided in C-2.
The state argues that the search warrant in question is "legally identical with respect to particularity of the description of the places to be searched" to the search warrant at issue in State v. Burgos; supra; and like the warrant in Burgos, it satisfies the particularity requirements. See, State's Memorandum p. 15. Burgos, however, is factually distinguishable from the present case. In Burgos, the warrant authorized a search of "the defendant's residence `# 76 West Avenue, Willimantic, CT, a green two story wood framed structure containing four separate apartments facing the building from West Avenue, two door colored white are visible, entrance to 76 is gained from a left side door, which has 76 in black to the left of it.'" CT Page 140107 Conn. App. 267. The warrant in Burgos identified the unit in question by providing the address of the building and the name of the person who resided in the unit. There were not multiple names listed of people who in fact lived in the same building, but in separate units. The warrant in this case, however, identified the unit by way of the building's address and the names of two people, who lived in separate units within the same building. Without additional information, such as the inclusion of the unit number, it is not clear from the warrant whether the intended location of the search was Satesh's unit or Deowraj's unit. Ultimately the warrant was overbroad, and Burgos is not dispositive of this issue.
Standards for reviewing overbroad warrants are set out by the United States Supreme Court in Maryland v. Garrison, 480 U.S. 79,107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). In Garrison, the Baltimore police obtained a warrant for the person of one McWebb, and the premises known as "2036 Park Avenue third floor apartment." The police believed that there was only one apartment on the described premises, but as it turned out, there were two. The police searched the wrong apartment and seized incriminating evidence that they found there. The Supreme Court upheld the trial Court's denial of defendant Garrison's motion to suppress, finding that the warrant and its execution were valid.
The Court in Garrison considered two issues in reaching its decision. First, the Court considered the validity of the warrant. It held that "the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing magistrate." Maryland v. Garrison, supra, 480 U.S. 85. The Court concluded that the officers' mistake was reasonable noting that specific inquiries were made to determine the identity of the occupants on the third floor of the premises. An officer went to the building to see if it matched the description given by the informant. A check was also made with the gas company and the electric company. The investigating officer specifically asked if there was more than one room registered as being on the third floor and he was told that there was only one listing and it was for the defendant. That officer also checked with the police department to see if the defendant's police records matched the address provided by the informant. Id., n. 10. CT Page 14011
Having concluded that the officers' conduct was reasonable, and therefore the warrant was valid, the Court next considered the execution of the warrant. The Court found that too, was valid. The Court held that the validity of the search of the defendant's apartment depended on "whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." Maryland v. Garrison, supra,480 Conn. 88. The Court reasoned: "If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search" to their suspect's quarters. Id., 86-87.
Moreover, the Court added, the officers were obligated to discontinue their search "as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." Id. The Court found that the officers failure to realize the overbreadth of the warrant was in fact reasonable in light of the facts available to the officers during the execution of the warrant. Upon entering the building the police encountered their suspect who accompanied them to the third floor. The suspect unlocked the door leading to the third floor. Once inside, the officers observed two doors which were open and the respondent Garrison standing in the hallway. The officers began searching in what they later learned was Garrison's apartment, yet neither McWebb nor Garrison said anything. When the officers did discover their mistake, they immediately discontinued their search.
This Court finds the reasoning of Garrison applicable to the instant case. However, this Court finds that the mistake of the officers here was not objectively understandable or reasonable. Rather, the failure of the officers to discover that the defendant lived in one of two apartments on the third floor of the building at 958 Broad Street was the result of an unjustifiably limited investigation. At the hearing, Detective Dodenhoff, one of the warrant affiants, testified that he believed the defendant and Satesh Buddhu lived together in one residence on the entire third floor of the building because Michael Casati told him that the two lived together on the third floor.[17] To corroborate this, he testified that he drove by the building at night to verify the building's location and CT Page 14012 appearance. He testified that he did not get out of his vehicle to observe the building up close because he was afraid of drawing the suspicion of the building's residents and thereby compromising the investigation. Thus, he testified, though he was aware of the fact that the police would be dealing with a multi-occupancy dwelling, he did not look to see if there were multiple doorbells. He did not investigate how many names were associated with the building. He testified that what he did to verify the defendant's address was run the defendant's name and Satesh Buddhu's name through the Department of Motor Vehicles' records. The records confirmed only that each man held a valid drivers license listing 958 Broad Street as his address. The records did not indicate in which unit each man resided. He further testified that before the search he did not know how many units were on the third floor. On cross-examination he conceded that although he relied upon Casati's information that the defendant and Satesh Buddhu lived together on the third floor, Casati never described for him the layout of the Buddhu residence or office. He also conceded that Casati never said anything about which door went to which unit and he could not recall if Casati said he had ever been in the office or the residence.
Sergeant Rossi, the supervisor of the search, also testified that prior to the search he was not aware of how many units there were on the third floor of the building. He testified that the police did not check with the electric company, the gas company, or the telephone company. He further testified that he did not recall seeing doorbells prior to the search, nor did he observe any mailboxes in the foyer or check to see if there were any. When asked on cross-examination why no effort was made to determine in which unit the family was living, Sergeant Rossi testified that he did not know because he did not do the preliminary investigation into that issue.
It is evident that the officers knew prior to obtaining the warrant that the building was a multi-occupancy building. This fact alone should have caused a reasonable officer to question whether or not an entire floor of an apartment building would be used as one residence. Moreover, had the officers bothered looking, they would have seen that there were six separate doorbells corresponding to the apartments inside the building. Defendant's Exh. "E". The officers had constructive notice that there was likely to be more than one residence on the third floor. Separate access, separate doorbells, and separate mailboxes are common indicators of separate residences. U.S. v.CT Page 14013Kyles, 40 F.3d 519 (2d Cir. 1994), cert. denied, ___ U.S. ___,115 S.Ct. 1419, 131 L.Ed.2d 302 (1995).
Detective Dodenhoff testified at the hearing that he did not want to approach the building on foot because he was fearful of drawing attention to the police presence and compromising the investigation. Assuming that to be true, Detective Dodenhoff could have investigated the living arrangements on the third floor by contacting the phone company, the electric company or the gas company to check for registered accounts. Indeed, additional evidence produced at the hearing revealed that each apartment had its own electric meter (Defendant's Exh. "D"), its own gas meter (Defendant's Exhibit "C") and its own phone line. Each of the third floor apartments also had its own telephone line.[18] See, Maryland v. Garrison, supra, 480 Conn. 85-86, n. 10 (the investigating officer's efforts were reasonable in checking with the gas company and the electric company before applying for the warrant); Hartsfield v. Lemacks, 50 F.3d 950
(11th Cir. 1995) (officer's efforts were not consistent with "reasonable" efforts to ascertain and identify the place intended to be searched as dictated by Garrison); U.S. v. Noel,938 F.2d 685 (6th Cir. 1991) (investigating officer's efforts were reasonable in checking with the phone company and the light, gas and water company, before applying for the warrant); U.S. v.Williams, 917 F.2d 1088 (8th Cir. 1990), cert. denied, ___ U.S. ___, 112 S.Ct. 101, 116 L.Ed.2d 71 (1991) (the investigating officer's efforts were reasonable in checking with the gas and electric company before applying for the warrant). Detectives Dodenhoff, Hedeen and the other officers involved, also failed to take any of these reasonable steps. Thus this Court finds that the officers failed to meet the minimum standards of reasonableness as set forth in Maryland v. Garrison, supra, 85, n. 10. The warrant was unreasonably overbroad and therefore invalid.
B. The Execution Of The Warrant
In the alternative, even if the Court had found that the warrant was substantiated by probable cause and was reasonably overbroad, its execution was illegal.
The evidence adduced at the hearing showed that when the police arrived at 958 Broad Street to execute the warrant, they were confronted with additional information about the location they were to search that day. Both Detective Dodenhoff and CT Page 14014 Sergeant Rossi testified at the hearing that when they went to 958 Broad Street, it was their intention to search one residence on the third floor. However, when the officers arrived at the building and proceeded to the third floor they discovered two doors, one to the left and one to the right. State's Exhibit "1". Sergeant Rossi testified that he knocked first on the left door, at which time Satesh Buddhu opened the door and admitted the officers. After conducting a protective sweep the officers then asked Satesh Buddhu where the defendant was. According to Rossi, Satesh indicated that the defendant was somewhere else in the building. Sergeant Rossi then asked where the defendant had his room and Satesh indicated it was in the other unit on the right. The police then gained entrance to the right unit by way of a key that was produced by Satesh Buddhu. Although Satesh initially refused to open the door, he relented when the Sergeant Rossi threatened to break it down. The right-hand unit was subsequently searched.
The validity of a search pursuant to an overbroad warrant will depend on "whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." Maryland v. Garrison, supra, 480 Conn. 88. Assuming in the present case, that the officers entry into the third floor common area was legal, as soon as the officers discovered that the warrant that they possessed quite possibly included multiple residences they "were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." Id., 87. Here, the officers were first put on notice when they observed the two doors indicating multiple residences. Both doors were closed, and at least the door on the right was locked, not like the doors encountered by the police in Garrison. Yet, upon seeing the two doors, the officers chose to proceed with the execution of the warrant and knocked on the left-hand door. When Satesh Buddhu answered the door, the police certainly had reason to take that as confirmation that they had found the place identified in the warrant. The warrant specifically stated that the police were to search the residence of Satesh and Deowraj Buddhu. The police then conducted an immediate protective sweep of the apartment. When they realized that the defendant was not there, they asked Satesh where he was and where his room was. Satesh indicated that the defendant was not there and that his quarters were in the other apartment to the right. Certainly by that point, if not upon seeing the two closed doors, reasonable officers should have realized the overbreadth of the warrant. The warrant authorized the search of one place — the residence of CT Page 14015 Satesh and Deowraj Buddhu. However, the facts as revealed indicated that Satesh and Deowraj lived in separate apartments. Instead of halting their search, securing the premises and obtaining another search warrant, the officers proceeded to enter the apartment on the right also. This they did through the hall door, because the apartments were not connected. They then conducted a full search of both units. The fact that the defendant's quarters were in an unattached apartment should have put any reasonable officer on notice that the warrant was overbroad and that any further search should be discontinued until a new warrant could be obtained and brought to the building.[19] Thus, the officers' continued search was objectively unreasonable.
The state argues that the search was legal because of the "community-living" exception to the warrant requirement. State's Memorandum, p. 16, citing, Commonwealth v. Smith, 898 S.W.2d 496
(Ky.App. 1995).[20] In Smith, the Court defined the "community-living exception" as "predicated upon the thesis that occupants of a single living unit, whether related or not, generally have at least some access to each other's bedrooms. Each resident's reasonable expectation of privacy is thereby diminished." (Citations omitted.) Commonwealth v. Smith, supra, 501. An example of community-living was provided by the Court: "[I]f three persons share an apartment, using a living room, kitchen, bath and hall in common but holding separate bedrooms which are not locked, whichever one of the three is responsible for the described items being in the apartment could have concealed those items anywhere within it, including the bedrooms of his co-tenants." Id. According to the community living requirement, the officers need not know that there is communal living occurring in the unit before the unit is entered.
Detective Dodenhoff testified that they searched both units because there was every appearance that the entire third floor was one residence. Both Dodenhoff and Rossi testified that the unit on the left had a furnished living room, kitchen, bathroom and two bedrooms. They testified that the unit on the right had a working office, a bedroom, bathroom and what appeared to be a kitchen that was not being used as such. They testified the kitchen appeared not to be in use because a hammock was hanging in the kitchen and there were no kitchen table or chairs. They also testified that while they were searching the apartments they discovered that they shared a telephone line. When asked on cross-examination if it appeared from the existence of the two CT Page 14016 hallway doors that it was one residence, Dodenhoff explained rather ambiguously that they believed the entire floor was one residence because of the information they obtained from Casati and the lay out of the apartments' interiors. Detective Dodenhoff and Sergeant Rossi maintained that while the defendant and Satesh Buddhu maintained bedrooms in separate units, the two units were being used as one residence by the family members in both units and, therefore, the warrant properly authorized the search of both units.
This Court finds that the community-living exception as defined in Commonwealth v. Smith is inapplicable to this case. The fact that the defendant would often have dinner with his children in apartment C-1 does not sway this Court.[21] That a key to the defendant's apartment was kept in C-1 and was available for use by his children or his ex-wife does not persuade the Court either. If possession of a spare key could turn two residences into one, a lot of people would be "living" with their neighbors. In the case at hand, there was not one "single living unit" in question, but two physically distinct units that were not connected by an interior door or window; each unit had its own key, doorbell, phone line, bathroom, kitchen area and living space.
For all of the aforementioned reasons this Court finds that the execution of the warrant was illegal.
III. THE INEVITABLE DISCOVERY RULE
In its post-hearing brief, the state argues that "[i]n the unlikely event that this Court concludes that the subject warrant is invalid, the Defendant's Motion to Suppress should nevertheless be denied based on the inevitable discovery exception to the exclusionary rule." State's Memorandum, p. 19. The inevitable discovery rule directs that "if the prosecution can establish by a preponderance of the evidence that the information [sought to be suppressed] ultimately or inevitably would have been discovered by lawful means then the deterrence rationale has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501,81 L.Ed.2d 377 (1984).
Under the circumstances of this case, the Court cannot find that the evidence that was seized would have ultimately been discovered by legal means. To qualify under the exception, the CT Page 14017 Connecticut Supreme Court has said, that "the state must demonstrate that the lawful means which made discovery inevitable were possessed by the police, and were being actively pursued prior to the occurrence of the constitutional violation." Statev. Badgett, supra, 200 Conn. 433. The state argues that the evidence seized from the defendant's apartment would have likely been discovered because Michael Casati was a cooperating police informant who was correct when he told the police that the Buddhus lived on the third floor of 958 Broad Street. The state further argues, that given the ongoing investigation it is likely that the information relating to the two doors would have been uncovered. This Court rejects the state's argument.
While Casati may have been a cooperating witness who was right about the Buddhus living on the third floor of 958 Broad Street, he had no information, besides for what appeared in the warrant affidavit, that linked the defendant to any criminal activity. The Court has already found that the information in the warrant was insufficient to establish probable cause to search Satesh's or the defendant's residence. However, even if there was probable cause to search Satesh's apartment, nothing incriminating was seized from the search of his apartment. Without any evidence linking the defendant to the alleged crimes, there would be no basis for a search warrant. Thus, this Court finds that the state cannot demonstrate that lawful means were being actively pursued prior to the illegal search that would have led to the inevitable discovery of the evidence seized from the defendant's residence and the office of Phoenix Consulting, the defendant's in-home business.
IV. THE GOOD FAITH EXCEPTION
Finally, the state claims that the officers had a good-faith basis for relying on the validity of the warrant they obtained to conduct the search of the defendant's residence. Thus, if the Court rules that the evidence in this case should be suppressed, the state argues that it is time for the Connecticut courts to recognize the good-faith exception to the warrant requirement.Contra, State v. Marsala, 216 Conn. 150, 154, 579 A.2d 58 (1990) (holding a good-faith exception to the exclusionary rule does not exist under Connecticut law). As the state correctly notes, however, this Court is bound by Supreme Court precedent and will not depart from the ruling in Marsala.
V. CONCLUSION
CT Page 14018
For all the aforementioned reasons, the Court makes the following finding and order:
1) The Search and Seizure Warrant dated November 22, 1995, authorizing the search of the residence of the defendant, Deowraj Buddhu was invalid.
2) All evidence seized pursuant to the search of the defendant's apartment and office at 958 Broad Street, C-2, is ordered suppressed in the case of State of Connecticut v. DeowrajBuddhu, Docket No. Cr 99-180524.
Dated at New Britain, Connecticut, this 21st day of October.
By the Court,
Espinosa, J.